Fredrick A. Hagen, SBN 196220
fhagen@berdingweil.com
Aaron D. Zimmerman, SBN 278624
azimmerman@berdingweil.com
**BERDING & WEIL LLP**
2175 N. California Blvd, Suite 500
Walnut Creek, California 94596
925/838-2090 (tel.) / 925/820-5592 (fax)

Attorneys for Plaintiffs
ALL AMERICAN HEMP COMPANY, LLC,
AAHC MANAGEMENT AND CONSULTING LLC,
And JOSEPH TRENKLE

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALL AMERICAN HEMP COMPANY, LLC, a Colorado Limited Liability Company, AAHC Management and Consulting LLC, a Colorado Limited Liability Company, and JOSEPH TRENKLE, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>PLANT TAPE USA, INC., a California corporation;<br><br>Defendant.<br>_____/ | Case No. Fredrick<br><br>**COMPLAINT FOR DAMAGES: BREACH OF CONTRACT; PROMISSORY FRAUD; AND CONCEALMENT**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1.      Plaintiffs relied on Defendant Plant Tape USA, Inc's ("Plant Tape") promises, representations and concealments regarding Plant Tape's experience and applicability of the Plant Tape process to growing hemp. In reliance, Plaintiffs expended substantial sums retooling their own processes to adopt the Plant Tape system and then supply Plaintiffs' own customers using the Plant Tape system.

2.      Plaintiffs suffered direct, consequential and incidental damages after Plant Tape's agricultural products and processes caused massive crop failures of Plaintiffs' hemp plantings, including loses related Plaintiffs' contracts with others.

## PARTIES

3.    Plaintiff All American Hemp Company, LLC ("AHC") is, and at all relevant times described herein was, a Colorado limited liability company.

4.    Plaintiff AAHC Management and Consulting LLC ("AAHC") is, and at all relevant times described herein was, a Colorado limited liability company. The principal place of business for both AHC and AAHC is located at 1013 E. Belleview Avenue, Cherry Hills Village, Colorado, 80121. Both AHC and AAHC are hereafter referred to as Plaintiffs or AHC.

5.    Plaintiff Joseph Trenkle is an individual and managing member of All American, with his principal place of residence and domicile located in Colorado.

6.    Defendant Plant Tape USA, Inc., ("Plant Tape") is a corporation organized and existing under the laws of the State of California, with its principal place of business at 1 Harris Road, Salinas, California, 93912. At all relevant times, Plant Tape was engaged in the business of marketing and selling agricultural products in California and other states.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over this action under 28 U.S.C. §1332 because: Plaintiffs are citizens of Colorado; Defendant is a citizen of California; and the matter in controversy exceeds, exclusive of costs and interest, seventy-five thousand dollars. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. §1367.

8.    This Court has personal jurisdiction over Plant Tape because it is: (i) incorporated, authorized to, and has, conducted business in California; and (ii) domiciled in California.

9.    Venue is proper under 28 U.S.C. §1391(a) and (b) because Defendant is domiciled in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Venue is also proper under 18 U.S.C. §1965(a) because Defendant transacts substantial business in this District.

**INTRADISTRICT ASSIGNMENT**

10.    Assignment to the San Jose Division would be proper because Defendant's business premises are located in Monterey County, California.

**PRELIMINARY ALLEGATIONS**

11.    In or about early 2019, AHC was introduced to and became aware of, and received solicitation and marketing materials, orally, electronically, and in formal writing, from Plant Tape regarding its proprietary Plant Tape process of sowing or planting seeds. An area or object that has had seeds planted in it is described as a sowed or sown area. The Plant Tape process is both a sowing and transplanting system. The Plant Tape process begins in one of their four sowing centers: Hollister, California; Livingston, Tennessee; Barcelona, Spain; or Boston, United Kingdom. Plant Tape receives a customer's seeds at one of its four sowing facilities, where they inventory and store seeds in a secure, climate-controlled room until sowing. The customer's seeds are then sown into Plant Tape's namesake innovation, a biodegradable tape that holds seeds and seedlings. After the material is sown, it is cut into strips (i.e., "tape"), folded, and placed into nursery trays. Each Plant Tape nursery tray holds 840 seeds. Plant Tape nursery trays are then palletized, wrapped, and labeled for delivery to a commercial nursery or farming operation, where nursery operators or a farmer can initiate germination by introducing the sown Plant Tape material to water or store the dry trays for later plantings.

12.    On or about February 28, 2019, AHC received a $776,108 quote by Plant Tape to sow 7,892,640 seeds. The payment terms, however, included a 50% "non-refundable" down payment due immediately and the balance due on delivery.

13.    In or around this time, Joseph Trenkle, AHC's COO Curtis Frank, and AHC's field operations manager Lupe Gutierez, toured the Plant Tape facility with Plant Tape's then-president Brian Antle, and Plant Tape's then-research development manager/farm support supervisor John Louis. At one point during the tour, Trenkle asked Mr. Antle how the plant tape process was able to keep the tap

roots from binding together throughout the entire process of germination to sowing and transplanting. Antle informed Trenkle that the Plant Tape product contained copper, a root inhibitor, which was used to keep the roots from binding together. Alarmed, because of his knowledge of the toxic effects of copper on hemp tap roots, Trenkle informed Antle that no copper could be used in the tape containing his seeds as it would most certainly kill his plants. In an effort to obtain AHC's business, Antle assured Trenkle that Plant Tape had a non-copper containing alternative product, and that if Trenkle/AHC entered an agreement with Plant Tape the non-copper alternative would be used for AHC's seeds.

14.     After further representations by Plant Tape about the superiority of its process, on or about February 27, 2019, AHC completed an *Application for Credit* to purchase all of its products and services from Plant Tape. The application disclosed specific company information, including bank account information and business references, and on the *Customer Set Up Maintenance* page, the Sterling, Colorado, location where the sowed seeds under contract would be shipped. A true and correct copy of the *Application for Credit* is attached as **Exhibit A**.

15.     Thereafter, on or about May 21, 2019, as part of the contracting procedure, Plant Tape required AHC to enter and execute a VENDOR CONFIDENTIALITY AGREEMENT, stating:

> The parties contemplate entering into a business arrangement pursuant to which VENDOR (AHC) may sell or provide certain products and services to Plant Tape.  In the process of negotiating such arrangement and subsequently thereto, Plant Tape may disclose to VENDOR (AHC) certain confidential information.  As a condition to participation in negotiations with Plant Tape, VENDOR (AHC) has agreed to maintain the confidentiality of the information and materials disclosed to it by Plant Tape and to preserve to Plant Tape the commercial benefits from the use of such information.

///

16.   *Confidential Information* in the VENDOR CONFIDENTIALITY AGREEMENT was defined very broadly to include information of Plant Tape that derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, including "materials and ingredients of Plant Tape products, business and operations plans, business strategies, marketing plans, know-how, competitive information and industry information." A true and correct copy of the VENDOR CONFIDENTIALITY AGREEMENT is attached as **Exhibit B**.

17.   In connection with the disclosure of *Confidential Information*, Plant Tape reasserted its earlier representations that it was a "revolutionary AgTech" company; it represented that it brings "precision agriculture" to growers of vegetables, tomatoes, and *hemp*. It claimed that its Plant Tape process allows for a 300% increase in plant density and shorter growing cycles, with the added benefit of automation to its customers. Plant Tape represented, verbally, electronically, and in writing, that its automated transplant system sets an industry standard for efficiency and ease-of-use. It claimed that while growers of vegetables, tomatoes, and hemp can triple transplanting output, these growers can also slash labor costs by 80% compared to alternative transplanting systems.

18.   Based on these confidential representations, coupled with Plant Tape's earlier representations, and in reasonable reliance that these representations were true, complete, tested, and accurate, and supported by sound science and experience, and made in good faith, AHC made the business decision to begin to use Plant Tape to sow its seeds for its growing customer base and existing clientele, and specifically to use it for one of its existing customers, Shining Star Farms, LLC, a limited liability company formed in the State of Kansas.

19.   In order to separate itself competitively from other hemp seed suppliers, AHC passed on Plant Tape's representations to its customers and potential

customers. AHC completely changed its business approach to supplying seeds, re-engineered its supply processes to incorporate and use the Plant Tape process, and invested considerable sums of money to modify its facilities and to re-position itself in the marketplace to be a supplier of hemp seeds sown by Plant Tape using the Plant Tape process. AHC's significant investment in modifying and re-tooling its processes and facilities, based on its reasonable reliance upon representations about the efficacy of the Plant Tape process, set the company on an ultimately catastrophic operational and financial trajectory.

20.    In late April 2019, after having been approved for credit, and assured of Plant Tape's credibility and the quality of the Plant Tape process, AHC entered a contract captioned **CUSTOM PLANTING, PLANT TAPE, AND SEED PURCHASE CONTRACT** with Shining Star Farms, LLC ("Shining Star Contract").

21.    The Shining Star Contract specifically called for AHC to use the Plant Tape process for sowing its seeds before supplying and planting 1,857,600 propagated seedlings on 387 acres of land furnished by Shining Star.  (A "seedling" is a young plant growing out of a seed.) The services provided by AHC to Shining Start were the following:

i.    AHC secured a supply of seed for industrial hemp plants ("Seeds") sufficient in specification and number to meet Shining Star's order.

ii.    AHC securely transported the Seeds from their place of origination to Plant Tape's sowing facility in California to be sowed by Plant Tape using the Plant Tape process.

iii.    After the Seeds were sown, AHC transported the sowed Seeds by armed guard from Plant Tape's sowing facility in California to Shining Star's property in Colorado.

iv.    AHC germinated and propagated the Seeds using the Plant Tape System of transplanting, which involves the following: From the nursery where the Seeds are sown, trays of Plant Tape transplants are loaded into bins and shipped to

the planting site.  The Plant Tape transplanter (tractor) accommodates 68 trays of seedlings.  At 840 seedlings per tray, the transplanter holds around 57,000 plants.  As the transplanter is pulled through the field, its planter modules pull the Plant Tape material from the trays.  Each tray's tape is clipped to the next to provide a seamless transplanting pull-through from tray to tray.  The planter module cuts the tape between plants and places each seedling into the soil according to precise plant spacing and depth settings.

22.     The purchase price of the Shining Star Contract was $2,786,400.00. Shining Star made a down payment to AHC of $1,393,200.00. The contract also included an "Additional Joint Venture" agreement whereby (i) Shining Star agreed to secure and provide additional acreage of irrigated farm land, (ii) AHC would, at its sole cost and expense, provide additional seeds and seedlings and will propagate and plant the same using the Plant Tape sowing process and transplanting system, and (iii) Shing Star and AHC would split all biomass produced from such additional acreage and planting according to the terms to be memorialized in a joint venture agreement.

23.     Between April 2019 and mid-June 2019, AHC contracted with Plant Tape to sow its seeds and transplant its seedlings and executed on the Shining Star contract.  By late June, the seedlings were all transplanted, and by the first part of July, virtually all the seedlings were dead or dying.  Because of the crop failure, Shining Star refused to pay the balance of the contract and sued AHC for recovery of its down payment and for damages.  The Joint Venture agreement never came to fruition. Furthermore, AHC prepared approximately 5,000,000 more seeds for germination, sowing and transplanting via the Plant Tape process at other nearby farms. However, by the time it became clear that the Plant Tape process was entirely unsuitable for the conditions and purposes for which it was marketed to AHC, the opportunity for germination and planting via other available methods had expired and AHC was unable to plant any of those seeds, resulting in a massive and

irreversible loss of profit.

24.    On or about May 14, 2019, in reliance on Plant Tape's representations regarding the effectiveness of its product, AHC entered into a custom planting and seed purchase contract with GoBright Biotech Colorado, LLC, valued at $303,750 for which AHC was to "procure and sell to [GoBright] [121,500] propagated, planted seedlings of industrial hemp plants. . . ." The services AHC were to provide to GoBright were identical to those provided in the Shining Star discussed *supra*. Additionally, the contract provided that: "[t]he seedlings. . . shall be transferred and conveyed to Buyer only after they have been procured, propagated, and planted by Seller at the Property using the Plant Tape system. . . ." Furthermore, the contract provided that "any damage to Seedlings occurring before, during, or immediately after planting by [AHC] will be the sole responsibility of [AHC], and [AHC] will make its best efforts to replace any damaged Seedlings and replant them with new Seedlings meeting the same specifications as soon as possible after such damage is discovered." Due to Plant Tape's failures as discussed within this complaint, AHC was unable to perform and fulfil its obligations under the contract.

25.    In or around May 2019, AHC was in ongoing negotiations with Great Horizons, LLC, for a custom planting and seed purchase contract valued at $1,296,000.00. Under that contract, AHC was to supply and transport the seedlings, as well as "germinate and propagate the Seeds using the Plant Tape System and maintain them until the Seeds have developed into propagated Seedlings with a height of approximately three to four inches." Due to Plant Tape's defective product, AHC was unable to fulfill its obligations under that contract as well.

26.    Notwithstanding Plant Tape's representations as hereinbefore alleged, Plant Tape was not a "revolutionary AgTech" company with experience sowing industrial hemp seeds. By omission, Plant Tape failed to disclose that unlike vegetables and tomatoes, industrial hemp is negatively affected by copper, an ingredient in Plant Tape, that is not properly weighted so that there is enough for

growth, but not too much to make the growth toxic, thereby bringing about death. Additionally, Plant Tape represents that each plant cell contains 97% less peat moss, however, peat moss is a substrate within Plant Tape cells that provides the capacity to store water within the substrate in the cell. Immediately after transplanting into the field, an adequate supply of water is critical to sustain the transplant until supplemental irrigation is provided. Plant Tape failed to warn of this critical requirement resulting from the severe reduction in the use of peat moss within Plant Tape. This Plant Tape substrate characteristic disfavors hemp transplant survival because (a) there is only a limited substrate water supply to sustain the hemp transplant and b) it causes a high rate of transpiration as the plant tries to cool itself from the heat of the sun, and under those conditions the limited stored water in the Plant Tape substrate is quickly exhausted.

27. While Plant Tape specifically advertised its products for sowing and transplanting industrial hemp, Plant Tape actually had no experience or scientific-based research to support its representation that its Plant Tape sowing process and transplanting system works well for industrial hemp.

28. Industrial hemp has been a federally regulated Schedule I drug under the Controlled Substance act since 1937. It was not until the Agricultural Improvement Act of 2018, also known as the 2018 United States Farm Bill, loosened cultivation restrictions of industrial hemp, allowing commercial production in the United States for the first time since 1937, that any system could legally perfect its processes. AHC's contract with Plant Tape was therefore the first United States growing season for legal commercial production of industrial hemp. It would have been illegal for Plant Tape to have commercially sown and plant industrial hemp to test the Plant Tape System on industrial hemp in the United States prior to 2019. As a result, its representations and its omissions were false, misleading, and deceitful.

29. While Plant Tape is otherwise experienced in sowing and transplanting primarily small stature cool season crops like lettuce and tomatoes in the free sandy

soils of Florida and California, it was not experienced in sowing and transplanting industrial hemp in the high desert environment of Colorado with clay soils. While Plant Tape had superior knowledge of this information, and it *knew* that AHC was entirely dependent on Plant Tape's processes and systems to sow its seeds and transplant its seedlings in the high desert environment of Colorado, as disclosed on the Customer Set Up Maintenance document that calls for shipping to Sterling, the "Queen City of the Plains" in Northeastern Colorado, Plant Tape failed to properly advise AHC of its limited experience in the applicable conditions. Plant Tape failed to recast its earlier representations of its competitive advantage in the field, and its quality, skill, and experience. Plant Tape failed to inform of the weaknesses and vulnerabilities with its revolutionary product and offered no counsel to mitigate the risk associated with its entrepreneurial foray as an ingenue seed sower and transplanter in Colorado with industrial hemp farming.

30.     Accordingly, Plaintiffs have been left with no choice but to file this action for damages caused by Defendants to Plaintiffs' business operations and reputation, along with indemnity for losses to Shining Star.

## **FIRST CAUSE OF ACTION**
### **(Breach of Contract)**

31.     Plaintiffs reallege and incorporate by reference all of the foregoing paragraphs as if set forth herein.

32.     On or about May 2019, AHC entered a contract with Plant Tape to provide seed sowing and transplanting services to AHC for the benefit of AHC's customer, Shining Star. The contract involves the sale of goods as defined under sections 2105(1) and 2107 of the California Commercial Code.

33.     Plant Tape breached the contract in numerous material respects, including without limitation by: (a) failing to deliver seedlings that when planted the plants could be maintained and harvested as mature plants; (b) failing to deliver the transplanting equipment at the agreed upon time; (c) sowing AHC's seeds with Plant

Tape material that was not free from defects; (d) providing substandard and deficient factory workmanship; (e) failing to adequately research the ability of its products to perform in the soil conditions in which it knew AHC was operating in Colorado; and (f) misrepresenting experience, quality, and performance capabilities handling industrial hemp seed.

34.    AHC has fully performed all its covenants and obligations under the contract, except those whose performance has been waived or legally excused.

35.    Implicit in the contract is a covenant of good faith and fair dealing obligating the parties to act towards each other in good faith, to deal fairly with one another, to make all material disclosures, and not to do anything which might deprive the other of the expectations and benefits of the contract and obligating each party to do everything that the contract presupposes to accomplish its purposes. Plant Tape breached the covenant of good faith and fair dealing.

36.    As a direct and proximate result of Defendants' breaches as described herein, AHC has been damaged in an amount to conform to proof at trial, but not less than $15,000,000.00, plus interest as allowed by law, and attorneys' fees and costs as provided by law.

37.    As a direct and proximate result of Defendants' breaches as described herein, AHC also suffered resulting consequential and/or incidental damages, including damages owed to AHC's customers, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### (For Promissory Fraud (False Promise))

38.    Plaintiffs reallege and incorporate by reference all of the foregoing paragraphs as if set forth herein.

39.    AHC repeats and realleges each allegation contained in the foregoing paragraphs of the Complaint as if set forth in full herein.

40.    At the time Plant Tape accepted AHC's credit application and agreed to sow AHC's seeds and deliver seedlings for planting in the Colorado acreage

1   identified on the Customer Maintenance Set Up sheet, Plant Tape sales and credit

2   people, acting within the scope of their employment as an executive, sales person,

3   marketing officer, credit manager, director or officer of Plant Tape, was acting on

4   behalf, by the instruction, and/or by the consent of Plant Tape to secure AHC's

5   current and future business.

6        41.    Plant Tape entered into the credit agreement and contract on about May

7   2019 with the intention of deceiving AHC into believing that Plant Tape: (a) was a

8   "revolutionary agtech" company with know-how and experience sowing and

9   transplanting industrial hemp seeds; (b) brings "precision agriculture" to growers of

10  hemp increasing their yields and lowering their costs; (c) uses a biodegradable tape

11  that is free from defects and presents no risk of crop failure in sowing industrial

12  hemp seeds; (d) informs its industrial hemp customers of everything needed to be

13  known so that transplanting is fast, easy to use, is precise, and reliable; (e) has a

14  transplanter that is "crop-agnostic" such that regardless of plant species there is no

15  difference in reliability or performance of the seedlings between industrial hemp and

16  other crops once the seeds have been sown into Plant Tape and transplanted with its

17  automated transplanter; (f) has many satisfied industrial hemp customers; (g) offers

18  the world's most advanced, efficient, and flexible process for sowing, germination,

19  and transplanting of industrial hemp.

20       42.    The representations made by such officers, employees, and agents on

21  behalf of Plant Tape and/or with the consent of or non-correction by Plant Tape,

22  were false at the time they were made, and Plant Tape knew they were false, and

23  they were made for the purpose of inducing AHC to contract with Plant Tape then

24  and in the future.

25       43.    At the time these false representations were made on behalf of Plant

26  Tape, AHC was ignorant of the true facts and believed the representations to be true.

27  AHC relied on the representations by agreeing to the VENDOR CONFIDENTIALITY

28  AGREEMENT, applying for credit divulging confidential financial information and

references, entering the contract with Plant Tape for sowing seeds and transplanting seedlings, supplying seeds to be sown, contracting for delivery of seedlings to Shining Star, agreeing to a joint venture agreement with Shining Star for further use of Plant Tape equipment and processes, reorganizing its business plan and offering Plant Tape industrial hemp seedling supply to other customers, and paying Plant Tape for the seedlings delivered from Plant Tape's California sowing facility to Shining Star's acreage in Northeastern Colorado. AHC's reliance was reasonable in that the false representations were made to it orally, electronically, and in writing by those who held themselves out with full authority to speak for and bind Plant Tape, and whose statements were repeated and corroborated on Plant Tape's website, social media platform, and other public documentation. At no time did Plant Tape or anyone acting for or on behalf of Plant Tape qualify or retract Plant Tape's representations.

44.     If AHC had known the true facts it would not have acted as it did and specifically, would not have contracted with Shining Star to supply seedlings purchased and sown by Plant Tape, nor pay Plant Tape for the materials and services under the contract.

45.     Plant Tape's officers and/or directors who authorized, directed, and/or participated in Plant Tape's allegedly tortious conduct alleged herein, are personally liable, along with Plant Tape for the tort of promissory fraud. (See, *Frances T. v. Village Green Owners Assn.* (1986) 42 Ca1.3d 490; PMC, Inc. v. Kadisha (2000) 78 Cal.App.4th 1368, 1380-1382.)

46.     As a direct and proximate result of the promissory fraud engaged in by Plant Tape, AHC has been damaged in an amount to be determined at time of trial, but not less than $15,000,000.00, plus interest.

47.     Plant Tape engaged in despicable conduct and acted with willful, reckless, and conscious disregard of the rights of Plaintiffs, and in doing the things herein alleged Plant Tape is guilty of oppression and malice. Plaintiffs seek punitive

and exemplary damages in an amount according to proof at trial.

## THIRD CAUSE OF ACTION

### (For Concealment)

48.    Plaintiffs reallege and incorporate by reference all of the foregoing paragraphs as if set forth herein.

49.    At the time Plant Tape accepted AHC's credit application and agreed to sow AHC's seeds and deliver seedlings for planting in the Colorado acreage identified on the Customer Maintenance Set Up sheet, Plant Tape, in order to secure AHC's current and future business intentionally failed to disclose that its representations regarding the efficacy and history of Plant Tape's products, services and processes did not, and in many ways could not, have been applicable to the hemp product to be delivered by AHC to Shining Star nor to the seedlings' end location in Colorado.

50.    AHC reasonably relied upon Plant Tape's representations and sophisticated marketing materials and was unaware that said representations did not actually apply either to hemp seeds or to their final destination in the high desert plateau of Northeastern Colorado.

51.    Plant Tape intended to conceal the reality that its claims regarding the efficacy and history of Plant Tape's products, services and processes were not applicable to hemp seeds or to the climate and growing conditions of AHC's known destination for delivery of its product to Shining Star for if it had not concealed that information, AHC would not have entered into the applicable arrangement with Plant Tape, since all of Plant Tape's purported expertise and "revolutionary agtech" was based upon other plant types and growing locations.

52.    Had AHC known that Plant Tape's representations regarding the efficacy and history of its products for hemp seeds were not accurate, it would have never changed its business to Plant Tape, re-engineered its supply processes to incorporate and use the Plant Tape process, and invested considerable sums of

money to modify its facilities and to re-position itself in the marketplace to be a supplier of hemp seeds sown by Plant Tape using the Plant Tape process.

53.     As a direct and proximate result of this concealment by Plant Tape, AHC has been damaged in an amount to be determined at time of trial, but not less than $15,000,000.00, plus interest.

**FOURTH CAUSE OF ACTION**

**(Equitable Indemnity)**

54.     Plaintiffs reallege and incorporate by reference all of the foregoing paragraphs as if set forth herein.

55.     On or about May 2019, AHC entered a contract with Plant Tape to provide seed sowing and transplanting services to AHC for the benefit of AHC's customer, Shining Star.

56.     Plant Tape failed to perform and deliver as promised, causing the loss of the entire crop planted for Shining Star using Plant Tape's planting system.

57.     On or about November 25, 2019, Shining Star brought an action against Plaintiffs in the District Court for Arapahoe County, Colorado, action no. 2019CV32767, to recover damages for the loss of the crop. After a trial, Judgment was entered against Plaintiffs and in favor of Shining Star for the amount of more than $1.4 million.

58.     The damages sustained by Shining Star were caused by Plant Tape's breach of contract with Plaintiffs, as alleged above, including the failure of Plant Tape's products and processes for sowing seeds as promised and Plant Tape's false promises and concealment. Had Plant Tape's products and processes performed as promised, Shining Star's entire crop would not have been lost.

59.     By the reason of the foregoing, Plaintiffs are entitled to an award of more than $1.4 million including costs and attorney's fees defending the claim in an amount to be proven at trial.

///

1  |  **PRAYER FOR RELIEF**

2  |  WHEREFORE, PLAINTIFFS request of this Court the following relief:

3  |  1.  For an award of compensatory damages allowed by contract, law and

4  |  equity, believed to be in excess of $15,000,000.00 to be determined, and in an

5  |  amount according to proof at trial and in excess of the jurisdictional limits;

6  |  2.  For an award of consequential damages, including lost profits, in an

7  |  amount to be proven at trial;

8  |  3.  For an award of incidental damages in an amount to be proven at trial;

9  |  4.  For a sum of at least $1.4 million as indemnity for loss incurred against

10  |  Shining Star, including costs and attorney's fees according to proof.

11  |  5.  Pre-judgment and post-judgment interest on all sums awarded, at the

12  |  maximum legal rate;

13  |  6.  For an award of costs and expenses for investigation, dispute resolution,

14  |  special masters, discovery referees, and other technical fees and costs;

15  |  For an award of punitive or exemplary damages according to proof;

16  |  7.  For an award of costs, including attorney's fees, incurred in this action

17  |  as provided by statute, contract, or common law; and

18  |  8.  For such other and further relief as the Court may deem just and proper.

19  |  **JURY DEMAND**

20  |  Plaintiff demands a trial by jury for all issues so triable under the law.

21  |

22  |  Date: June 6, 2023                    **BERDING & WEIL LLP**

23  |

24  |  By: _____

25  |  Fredrick A. Hagen
      Attorneys for Plaintiffs

26  |  All American Hemp Company, LLC,
      AAHC Management and Consulting,
      LLC, and Joseph Trenkle

27  |

28  |

# EXHIBIT A

 PlantTape

# PLANT TAPE USA, INC.
## APPLICATION FOR CREDIT

BY: _All American Hemp Company llC DBA_ _1-17-2016_
NAME OF COMPANY OR INDIVIDUAL    _AAHC Management_     DATE CO. STARTED
_Consviting_

_2165 So. Kalamath St_
ADDRESS

_Denver_ _Co_ _80223_ _720-355-4503_
CITY           STATE      ZIP CODE     PHONE NUMBER

The above named company/individual hereby applies for credit in accordance with the terms and conditions of:

TO:   **PLANT TAPE USA, INC.**       PHONE:   (831) 455-3644
      **Credit Department –Deesa Balasingam**
      **P. O. Box 4070**          *CREDIT TERMS:*   *30 Days*
      **Salinas, CA  93912-4070**

   The following information must be provided (information provided will be held strictly confidential).

**OWNERSHIP:**
- [x] Corporation        [ ] Incorporated within last 12 months
- [ ] Partnership        [ ] Individual     Tax ID #:  _82-3060415_

| NAME(S) OF PRINCIPAL(S) | COMPLETE ADDRESS | PHONE NO. |
|---|---|---|
| 1. _Joe Trenkle_ | _1073 E Bellview Ave_ | _303-808-2621_ |
| 2. _Curtis Frank_ | | _303-877-6968_ |
| 3. | | |
| 4. | | |

**FINANCE:**
_Bank of America_
BANK                          ADDRESS

BANK OFFICER/DEPARTMENT                          PHONE
_139103121155_        _139 103121142_
ACCOUNT NUMBER(S)

**REFERENCES:**
| BUSINESS NAME | ADDRESS | PHONE # |
|---|---|---|
| 1. _Cultivate Colorado_ | _Buchtel Blvd._ | _303-954-9919_ |
| 2. _American Clay Warehouse_ | _5th Ave_ | _303-534-4044_ |
| 3. _MSE labs_ | | _978-265-1696_ |
| 4. _Goode corp_ | | _424-253-0093_ |

We certify that all the information on this form is correct.  We fully understand your credit terms and agree to the proper payment in consideration of extended credit.

SIGNED: _[signature]_                   _Presudent + CEO_
         (MUST BE OFFICER OF CO.)                    TITLE
_Joe Trenkle_                       _2-27-18_
PLEASE PRINT NAME        PACA OR DRC #        DATE

 **PlantTape**

### CUSTOMER SET UP MAINTENANCE

| | |
|---|---|
| Customer's Name | **All American Hemp Company LLC** |

Date: 2/27/2019

Domestic Customer [x]     Export Customer [x]

New Sold To [X]     New Ship To [X]     Change [ ]

| Sold To Information | NOTE: If New Sold to, or reactivating existing code, please attach completed and signed Credit Application Form. |
|---|---|

Billing Address   2165 So. Kalamath St.

City  Denver     State  Colorado     Zip Code  80223

Phone #  303-808-2621     Fax #

Email:  joe@allamericanhempcompany.com (To receive electronic Invoices)

Related Parent (Group) Code #

| Ship To Information | |
|---|---|
| | (If adding new Sold To also, complete section above) |

Ship To #

Shipping Address  15768 County Road 41

City  Sterling     State  CO     Zip Code  80751

Phone #  3038082621     Fax #

Related Sold To #

| Special Delivery Instructions |
|---|

| Salesperson Information |
|---|

Salesperson #

# EXHIBIT B

# VENDOR
# CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement is entered into as of the date first set forth on the signature page by and between Plant Tape USA, Inc., a California corporation, and its subsidiaries and affiliates (collectively, "Plant Tape"), and _All American Hemp Company_ located at _1013 E. Bellewisrase, Littleton, Co_ and its affiliated, employees, agents and representatives (collectively, "VENDOR").

## PURPOSE

The parties hereto contemplate entering into a business arrangement pursuant to which VENDOR may sell or provide certain products and services to Plant Tape. In the process of negotiating such arrangement and subsequently thereto, Plant Tape may disclose to VENDOR certain confidential information. As a condition to participation in negotiations with Plant Tape, VENDOR has agreed to maintain the confidentiality of the information and materials disclosed to it by Plant Tape and to preserve to Plant Tape the commercial benefits from the use of such information and materials.

## AGREEMENT

1. <u>Definition</u>. "Confidential Information" means information (including, without limitation, reports, surveys, photographic reproductions, videos, market data, technical data, drawings, methods, techniques, lists and processes) of Plant Tape, its customers and agents, that derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and includes, without limitation, financial information, information concerning the contracts of Plant Tape, information concerning products of Plant Tape, information concerning materials and ingredients of Plant Tape products, business and operations plans, business strategies, marketing plans, know-how, competitive information and industry information. Confidential Information may be written, oral, expressed in electronic media or otherwise disclosed, and may be tangible or intangible. All information disclosed by Plant Tape to VENDOR (whether before or after the date of this Agreement) in connection with any business arrangement or agreement between the parties will be conclusively presumed to be Confidential Information. Additionally, all information developed by VENDOR for Plant Tape or related to the business of Plant Tape shall be conclusively presumed to be Confidential Information.

2. <u>Obligations Concerning Confidentiality and Limited Use</u>. VENDOR agrees that, as to any whole, partial, extracted or derivative portion of the Confidential Information: (i) it will maintain and preserve the confidentiality of the Confidential Information, including, without limitation, taking such steps to preserve the confidentiality of the Confidential Information, (ii) it will only disclose the Confidential Information to its own employees on a "need-to-know" basis and will include this document with any such disclosure as notice of the employee's obligation of confidentiality and of Plant Tapers proprietary rights, (iii) it will only disclose the Confidential Information only to such employees who have agreed in writing to maintain the confidentiality thereof, and (iv) it will use the Confidential Information only in connection with the contemplated business arrangement with Plant Tape and as necessary to perform its contractual obligations pursuant thereto and that it will not otherwise use for its benefit or the benefit of any third party any of the Confidential Information.



Page 1 of 3

This Agreement is entered into by parties on this __May 21ST__ day of __May__ 2019.

VENDOR:                                    PLANT TAPE

                                           PLANT TAPE USA, INC.
                                           A California Corporation

By: _____                    By: _____
Name: _____                         Brian Antle, President
Title: _____